BOERSCH SHAPIRO LLP
David W. Shapiro (CA Bar No. 219265)
Dshapiro@boerschshapiro.com
Martha Boersch (CA Bar No. 126569)
Mboersch@boerschshapiro.com
Lara Kollios (CA Bar No. 235395)
Lkollios@boerschshapiro.com
235 Montgomery Street, Suite 835
San Francisco, CA 94104
Telephone: (415) 500-6640

Attorneys for Defendant
JORDAN JACKSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 13-CR-00363 EMC |
| Plaintiff, | |
| v. | DEFENDANT JORDAN JACKSON'S SENTENCING MEMORANDUM (FILED UNDER SEAL) |
| JORDAN JACKSON and MERCEDEZ KIDD, | |
| Defendants. | |

Defendant Jordan Jackson respectfully submits this sentencing memorandum.  A redacted version of this memorandum is filed publicly because it contains confidential information about Mr. Jackson and VM.

JACKSON'S SENTENCING MEMO
Case No.: 13-CR-00363 EMC

# TABLE OF CONTENTS

PROCEDURAL HISTORY.................................................................................................1

SUMMARY AND SENTENCING RECOMMENDATION ........................................2

I.      Jordan Jackson's Background.................................................................4

II.     The Psychological Evaluation of Jordan Jackson .................................5

III.    The Background of the Offense Conduct ..............................................6

IV.     The Parties' Stipulation Reflects the Facts Upon Which the Sentence Should be Based ............................................................................................................12

V.      The Proper Consideration of the Sentencing Factors ........................16

The Analysis of the 3553 Factors ...........................................................................20

1.      The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 USC § 3553(a)(1)) ...............................20

2.      Need for Just Punishment in Light of the Seriousness of the Offense, 18 USC § 3553(a)(2)(A) ...........................................................................................20

        a.      *The Seriousness of the Offense* .....................................20

        b.      *Just Punishment* ..............................................................21

3.      General and Specific Deterrence (18 USC § 3553(a)(2)(B), (C)) ...............22

4.      Educational and Vocational Training and Medical Care  (18 USC § 3553(a)(2)(D))..24

5.      The Sentence Requested Meets the Purposes of Sentencing Under the Circumstances in this Case 18 USC § 3553(a)(3) ............................................24

6.      The Sentencing Range Provided For in the Advisory Guidelines (18 USC § 3553(a)(4)) ........................................................................................................25

        a.      The Base Offense Level is Not Reasonable or Reliable ...............................26

        b.      The Two Point Upward Adjustment for the Use of A Computer Results in an Unreasonable Potential Sentence ......................................28

        c.      The Undue Influence Adjustment Does Not Apply.......................................29

        d.      The Criminal History Calculation Is Overstated ..........................................30

        e.      Remorse and Acceptance of Responsibility .................................................33

7.      The Need to Avoid Unwarranted Sentence Disparities Among Defendants  (18 USC § 3553(a)(6)) ........................................................................................34

8.      The Need to Provide Restitution  (18 USC § 3553(a)(7)) ...........................36

9.      Prior Custody .........................................................................................36

Objections to the Pre-sentence Report.................................................................................36

CONCLUSION.....................................................................................................................37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JACKSON'S SENTENCING MEMO
Case No.: 13-CR-00363 EMC

## TABLE OF AUTHORITIES

**Cases**

*Alleyne v. United States,* 570 U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013)................................15

*Apprendi v. New Jersey*, 530 U.S. 466 (2000).................................................................................15

*Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)..............................15

*Bearden v. Georgia*, 461 U.S. 660 (1983)....................................................................................36

*Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007)...................15, 19, 26

*Kimbrough v. United States*, 552 U.S. 85 (2007) ...............................................19, 26, 28, 33

*Nelson v. United States*, 129 S.Ct. 890 (2009) (per curiam)...........................................................18

*Pepper v. United States,* 131 S.Ct. 1229 (2011) ..........................................................................19, 33

*Peugh v. United States,* 2013 WL 2459523, 1  (U.S., June 10, 2013).............................................18

*Peugh v. United States*, 133 S. Ct. 2072 (2013) (Thomas, J., dissent) ............................................19

*Rita v. United States*, 551 U.S. 338 (2007)...................................................................................19

*United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009) ..............................................19

*United States v. Beiermann*, 599 F.Supp.2d 1087  (N.D. Iowa 2009)...........................................26

*United States v. Berger*, 587 F.3d 1038 (9th Cir. 2009) ................................................................16

*United States v. Bogan*, 788 F. Supp. 433 (N.D. Cal. 1992) .........................................................23

*United States v. Booker*, 543 U.S. 220 (2005) ...........................................................17, 18, 19

*United States v. Bowser*, 941 F.2d 1019 (10th Cir. 1991) .............................................................31

*United States v. Bridgewater*, 479 F.3d 439 (6th Cir. 2007) .........................................................20

*United States v. Brooks*, 610 F.3d 1186 (9th Cir. 2010) ...............................................................29

*United States v. Brown*, 985 F.2d 478 (9th Cir. 1993)...................................................................32

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ..................................................................18

*United States v. Charles*, 13-11863, 2014 WL 3031267 (11th Cir. July 7, 2014)...........................15

*United States v. Cooper*, 739 F.3d 873 (6th Cir. 2014) ................................................................15

*United States v. Cortes-Meza*, 411 F. App'x 284, 294 (11th Cir. 2011) .......................................35

*United States v. D.M.*, 942 F.Supp.2d 327 (E.D.N.Y.  May 1, 2013) (Weinstein, J.) .........................5

*United States v. Daas*, 198 F.3d 1167 (9th Cir. 1999)...................................................................35

*United States v. Dallman*, 533 F.3d 755  (9th Cir. 2008) ..............................................................18

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) ............................................................23

*United States v. Fitch*, 659 F.3d 788 (9th Cir. 2011)....................................................................16

*United States v. Garate*, 543 F.3d 1026 (8th Cir. 2008) ...............................................................22

*United States v. Garcia*, 497 F.3d 964 (9th Cir. 2007)..................................................................18

*United States v. Guerrero-Jasso*, 752 F.3d 1186 (9th Cir. 2014)......................................................15

*United States v. Harris,* 679 F.3d 1179 (9th Cir. 2012)......................................................25

*United States v. Horvath*, 492 F.3d 1075 (9th Cir. 2007)......................................................13

*United States v. Husein*, 478 F.3d 318 (6th Cir. 2007)......................................................25

*United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008)......................................................22

*United States v. Jones*, 460 F.3d 191 (2d Cir. 2006)......................................................17

*United States v. Jones*, 997 F.2d 1475 (D.C. Cir. 1993)......................................................34

*United States v. Lee*, 725 F.3d 1159 (9th Cir. 2013) ......................................................13

*United States v. Martin*, 363 F.3d 25 (1st Cir. 2004)......................................................36

*United States v. Mason*, 961 F.2d 1460 (9th Cir. 1992) ......................................................13

*United States v. McBride*,  434 F.3d 470 (6th Cir. 2006) ......................................................18

*United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) (en banc) ......................................................17

*United States v. Miller*, 991 F.2d 552 (9th Cir. 1993) ......................................................36

*United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006) ......................................................2

*United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2001) ......................................................32

*United States v. Mitchell,* 624 F.3d 1023 (9th Cir. 2010) ......................................................19

*United States v. Mohamed*, 459 F.3d 979 (9th Cir. 2006) ......................................................17

*United States v. Munoz–Camarena*, 621 F.3d 967 (9th Cir. 2010) ......................................................17

*United States v. Nunez*, 13-1702, 2014 WL 2566099 (6th Cir. June 9, 2014) ......................................................15

*United States v. Plouffe*, 445 F.3d 1126 (9th Cir. 2006)......................................................17

*United States v. Restrepo*, 946 F.2d 654 (9th Cir. 1991) ......................................................16

*United States v. Reyes*, 8 F.3d 1379 (9th Cir. 1993)......................................................32

*United States v. Robinson*, 20 F.3d 1030 (9th Cir. 1994) ......................................................24

*United States v. Sanchez-Rodriguez*, 161 F.3d 556 (9th Cir. 1998) ......................................................32

*United States v. Schroeder*,  536 F.3d 746 (7th Cir. 2008) ......................................................18

*United States v. Smith*, 719 F.3d 1120 (9th Cir. 2013) ......................................................29

*United States v. Stall*, 581 F.3d 276 (6th Cir.  2009)......................................................5

*United States v. Thompson*, 109 F.3d 639 (9th Cir. 1997)......................................................24

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) ......................................................23

*Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970)......................................................36

*Williams v. New York*, 337 U.S. 241 (1949) ......................................................33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Statutes**

18 USC § 1591 .................................................................................................................27

18 USC § 1594 ...............................................................................................4, 24, 25, 28

18 USC § 2422 .................................................................................................................27

18 USC § 3551 .................................................................................................................24

18 USC § 3553 ........................................................................................................... passim

18 USC § 3559 .................................................................................................................25

18 USC § 3582 .................................................................................................................20

18 USC § 3583 .................................................................................................................25

USSG § 2G1.3 .................................................................................................................27

USSG § 2G2.2 .................................................................................................................26

USSG § 3D1.2 .................................................................................................................32

USSG § 4A1.2 ...........................................................................................................30, 31

USSG § 5H1.4 .................................................................................................................18

USSG § 5K2.13 ...............................................................................................................18

USSG § 6B1.3 .................................................................................................................16

USSG § 6B1.4 .................................................................................................................13

USSG Appendix C, Amendment 664 .............................................................................27

USSG Appendix C, Amendment 701 .............................................................................27

**Other Authority**

Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) ..............................................................................................................22

Committee on Criminal Law of the Judicial Conference of the United States, public comment, March 11, 2014 .......................................................................................................................27

*Criminal Law--Federal Sentencing--Ninth Circuit Affirms 262-Month Sentence Based On Uncharged Murder.--United States V. Fitch, 659 F.3d 788 (9th Cir. 2011)*, 125 Harv. L. Rev. 1860, 1867 (2012) ............................................................................................................................16

David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) .............................................................................22

Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) .23

Eric Holder, *Attorney General Eric Holder Speaks at the 15th Annual National Action Network Convention* (2013) .............................................................................................................4

Eric Kurhi, *Rally decries uptick in prostitution along S. First Street in San Jose* (2012) .....................7

Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) .......................................................................................23

H.R. CONF. REP. 106-939, 89...........................................................................21

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 2829 (2006) ..............................................................22

S. Rep. 98-225, 75-76, 1984 U.S.C.C.A.N. 3182 ......................................22

S. Rep. No. 98-225 (1983) ..............................................................20

Sentencing Reform Act..................................................................20, 23

Smith, *Human Trafficking and RICO*, 18 Geo. Mason L. Rev. 759............................35

U.S. Sent'g Comm'n, *Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004).......................................23

U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"] ..................................................28

U.S. Sentencing Commission datafile for fiscal year 2012 ...............................28

US Attorney's Manual § 8-3.120.........................................................35

Weitzer, *Legalizing Prostitution:  From Illicit Vice to Lawful Business* (NYU Press 2012).....6, 14, 27

## PROCEDURAL HISTORY

On November 20, 2013, Jordan Jackson entered into a plea agreement with the government, pursuant to which the parties stipulated to relevant facts and to a sentencing guideline calculation, while preserving Mr. Jackson's right to explain why the guidelines should be given no, or little, weight in determining his sentence as part of the 18 USC § 3553 analysis.

The stipulated facts were straightforward:  Mr. Jackson admitted that, for two weeks, he and his girlfriend (Mercedez Kidd) acted as pimps for a 16 year old woman (VM), who had been working as a prostitute and who he met through a well-known prostitution advertising website called myRedBook.com.

As to the sentencing guidelines calculation, the parties disputed whether a two point enhancement for "undue influence" applied.

Mr. Jackson entered a guilty plea pursuant to his agreement.  Thereafter, the government provided police and/or FBI reports to the Probation Department (unidentified to the defense), and the Probation Department used the reports to draft a presentence report (the PSR).  The Probation Department did not interview anyone with personal knowledge of the events, other than Mr. Jackson and Ms. Kidd.  In particular, the Probation Department did not interview VM.

The draft PSR was disclosed to the parties on April 9, 2014.  Mr. Jackson served extensive objections to that draft PSR.

The final PSR was disclosed to Mr. Jackson on June 11, 2014.  It responded to Mr. Jackson's objections to the facts set out in the draft PSR by putting a summary of Mr. Jackson's version of events in parentheses – as though his version was entitled to less credibility than the police reports' version.  The final PSR also failed to address other objections raised by Mr. Jackson, such as the inclusion of offenses in the PSR that the USSG directs not be awarded "points" and the overstatement of Mr. Jackson's criminal history, among other things.

On June 12, 2014, the government advised Jackson's counsel that it would not call VM as a witness or request an evidentiary hearing for the sentencing.

On June 13, 2014, the Probation Department advised counsel for Mr. Jackson that the government's decision not to request a hearing or call witnesses would have no effect on the PSR.

With due respect to the Probation Department, the PSR cannot stand in its present form; the Probation Department is wrong in its assertion that the PSR may include disputed facts. The PSR should reflect the stipulated facts and not facts to which Mr. Jackson objected as incorrect or exaggerated. The PSR is the only document on which the Bureau of Prisons relies to calculate Mr. Jackson's security level, designate him to a prison, and treat him.

## SUMMARY AND SENTENCING RECOMMENDATION

The defendant Jordan Jackson respectfully requests that the Court impose a prison sentence of not more than 27 months, with an appropriate term of supervised release. That is a prison sentence that meets the central mandate of Section 3553: it is reasonable and fair and would be a sentence "sufficient, but not greater than necessary," to reflect the seriousness of the offense, offer adequate deterrence, protect the public, and provide Mr. Jackson with family support and counseling. It is critical that the Court impose the lowest sentence consistent with justice and not one that may be equally reasonable because Congress and the Supreme Court have insisted that it is the lowest fair sentence, and not just any fair sentence, that should be imposed. *See United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006) ("Plainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher").

The Court should accept our recommendations over those of the government and Probation Department for several reasons:

1.      The PSR and the recommendation of the Probation Department are based solely on the sentencing guideline calculation, which was in turn based on information passed to the probation officer by the government – and that information was wrong and incomplete. The facts to which the parties stipulated should control.

2.      The PSR presents a distorted story and is based on an incomplete FBI investigation. The FBI failed to do the following:

a.      Analyze the cell phone text messages and calls from and to other people using phones of VM, Ms. Kidd, and Mr. Jackson to determine whether VM accompanied Kidd and Jackson voluntarily;

1    b.    Interview VM's prostitution customers, family, and friends to determine what

2  she told them about her whereabouts during the two week period at issue, whether she told anyone

3  she was being held against her will, why her friend Brandon (who had taken her to San Jose from

4  Modesto) never reported her missing to police, and why no family member or other friend reported

5  VM missing during the two weeks she was living with Ms. Kidd and Mr. Jackson, among other

6  things;

7    c.    Determine how VM operated her prostitution business before (and after) she

8  met Ms. Kidd and Mr. Jackson;

9    d.    Interview hotel, restaurant, and retail store employees (and BART police and

10 employees) who must have seen VM with Kidd and Jackson during the two week period.  VM, Ms.

11 Kidd and Mr. Jackson stayed at six different hotels during the two week period.  Ms. Kidd and Mr.

12 Jackson left VM alone for hours at a time when she had customers scheduled to come.  Some

13 customers never showed up, and VM was thus alone – and free to call anyone or to leave – for hours

14 at a time.  Yet, VM made no calls to police, family, friends, or hotel clerks; she made no attempt to

15 leave.  To the contrary, she admitted to police that, at some point, she left and came back to be with

16 Kidd and Jackson – despite having secreted hundreds of dollars for herself;

17    e.    Obtain and analyze VM's Facebook and other social media pages before and

18 after the events in question to determine the credibility of her assertions.

19    3.    The PSR improperly calculates the sentencing guidelines because it includes

20 information that is inconsistent with the guilty plea and the stipulated facts, it includes information

21 that is inconsistent with the prior statements of VM, and there is an insufficient basis on which to

22 expand the offense conduct as the PSR contends it should be extended.  The PSR consigns Mr.

23 Jackson's version of events to a kind of rebuttal of hearsay VM's statements – which should not be

24 credited because VM failed to make herself available to the probation officer for an interview and

25 contradicted herself in statements to the San Francisco Police and the FBI.  Mr. Jackson not only met

26 with the probation officer, but also expressed a desire to talk to the probation officer after reading

27 additional allegations made by VM to the FBI and AUSA.

28    4.    An analysis of the section 3553 factors results in a reasonable sentence of no more than 27

3    JACKSON'S SENTENCING MEMO
Case No.: 13-CR-00363 EMC

months in prison – the average sentence for a person sentenced under 18 USC § 1594 during 2012. The sentencing guidelines should play no or little role in that analysis because they are not based on empirical evidence, and they fail to take into account vast differences among people convicted of the crime (and instead arbitrarily assign a base offense level of 24 to all such individuals).

The Attorney General's statement that "[t]oo many people go to too many prisons for far too long for no good law enforcement reason" is especially apt here.  This is a sad situation, and Mr. Jackson deserves to be punished, but he is certainly redeemable and his chances of re-offending are small.  A long sentence would, as the Attorney General noted, "breed disrespect for the system" and would not rehabilitate or deter, but rather "warehouse and forget" Jordan Jackson. http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130404.html

In this memorandum, we will (1) provide an account of the circumstances of the crime; (2) analyze the section 3553 factors as they relate to Mr. Jackson and the crime; (3) discuss why the proper sentencing guideline is level 25, criminal history category II, and not, as the probation department concluded, level 27, criminal history category IV; and (4) explain why Mr. Jackson should receive the sentence we recommend.

## I.   <u>Jordan Jackson's Background</u>

Jordan Jackson was born on July 20, 1987 in Oakland.  He grew up primarily in Hercules, attended the Pillow preschool, and had two half sisters – daughters of his father from a previous marriage.  He attended the Ohlone Elementary School for kindergarten through fourth grade, then transferred to the Hannah Ranch school.  While in grade school, Jackson was diagnosed with ADHD. Yet, despite struggling with ADHD, Mr. Jackson was still able to earn average grades and play organized sports at a high level.  When he enrolled at Silesian High School, he made the Varsity baseball team as a sophomore and was a starting pitcher and infielder for three years of high school, earning honors as a Best Pitcher on the 1st Team All League.

Jackson attended Contra Costa Junior College in San Pablo, where he continued to play baseball and worked hard at his academics, making the Dean's list with a 3.7 GPA in one semester.

1 ███████████████████████████████████████████████████████

2 ███████████████████████████████████████████████

3        Nevertheless, Mr. Jackson pursued his education; he *tried* the right course.  However, when

4 he went to college, things began to unravel for him and he began to take ecstasy and other drugs.

**II.     The Psychological Evaluation of Jordan Jackson**

6        ███████████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ███████████████████████████████████████████████████

9 ██████████████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ██████████████████████████████████████████████████████

12 ███████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████

15        These are important findings because they firmly support a short prison sentence.  *See United*

16 *States v. D.M.*, 942 F.Supp.2d 327 (E.D.N.Y.  May 1, 2013) (Weinstein, J.) ("Particularly useful at

17 sentencing in [possession of child pornography cases] is expert testimony.  The evaluation of experts

18 in the fields of psychology, well-trained on unique issues relevant to sex offenders, can be highly

19 relevant in helping the court determine the effectiveness of a particular sentence.  Judges commonly

20 examine offenders' rehabilitation efforts in determining the likelihood of recidivism and in crafting

21 appropriate sentences."); *United States v. Stall*, 581 F.3d 276 (6th Cir.  2009) (in child pornography

22 case where guidelines were 57-65 months, court's sentence of 1 day in jail, 10 years supervised

23 release, and one year house arrest, not unreasonable in part because of testimony by expert as to

24 defendant's mental state, ongoing therapy,  and unlikely chance of recidivism).

25        The Court must punish Mr. Jackson, but a short prison sentence will be more effective than a

26 long one to achieve the section 3553 goals.  A short sentence will punish Mr. Jackson, separate him

27 from Ms. Kidd (with whom he had a dysfunctional relationship), and start him on a path to a drug-

28 free and productive life.  The Court need not be concerned that a short sentence would release a

1  violent person back into society.

2  **III.**     **The Background of the Offense Conduct**

3          Mr. Jackson met Mercedes Kidd in August 2012 in a chance meeting on BART.  They began

4  dating soon thereafter.  Kidd, who was 24 years old at the time, had been prostituting for about eight

5  years before then, from the age of 15.  She regularly worked with boyfriend-pimps in her business,

6  and, about two weeks after they began dating, Kidd told Jackson that she wanted to work with him.

7          The two dated for about nine months, during which Ms. Kidd engaged in prostitution and,

8  while they often argued, there were no physical altercations between the two.  Kidd and Jackson both

9  abused drugs and alcohol during this time.  Ms. Kidd had been using drugs since she was 15 years

10  old.  While Mr. Jackson started using drugs later in his life, they both used cocaine,

11  methamphetamine, and marijuana together.  Ms. Kidd had also used heroin.  She also had medication

12  for bipolar disorder, which she sometimes chose not to take.

13          Then, in September 2012, while at a BART station, Jackson told Kidd he thought she was

14  manipulative.  Ms. Kidd, who had been drinking alcohol, punched Mr. Jackson in the side of the face.

15  Jackson hit Kidd back, which resulted in a bruise near her eye.  Mr. Jackson and Ms. Kidd

16  nevertheless maintained their relationship; Kidd posted bail for Jackson in the domestic violence

17  case.  Jackson regularly attended domestic violence classes until he was arrested and detained in this

18  case.

19          Ms. Kidd told Mr. Jackson that the bruise on her face would interfere with her ability to get

20  prostitution customers.  She told Jackson that they should recruit another prostitute to work with

21  them.

22          Ms. Kidd and Mr. Jackson then viewed different profiles on myRedBook.com – a website

23  devoted to advertising for prostitution services – and, on April 6, 2013, contacted VM – who said that

24  she was 19 years old in her advertisement.[1]  VM used the myRedBook names "HoneyNut," "Nevada"

25  and "Sarah."  VM told the police that she never told a customer that she was under 18 years old, and

26  ───────────────

27          [1]  Websites like myRedBook provide a forum for prostitutes to list "services and prices,
biographical sketches, and photos" and it contains message boards for clients.  Weitzer, *Legalizing
Prostitution: From Illicit Vice to Lawful Business* 34 (NYU Press 2012).  According to Weitzer,

28  services like myRedBook reflect "an emergent subculture with its own etiquette and code of ethics."
*Id.*

instead confirmed to customers that she was 19 years old.

After several text messages between them (which are attached as Exhibit 2), VM arrived about 30-45 minutes after Mr. Jackson called her phone at 408-xxx-xxxx at the Motel 6 in Sunnyvale where Kidd and Jackson were staying.  She had on a V-neck short sleeve brown shirt, blue jeans, and 3" heels.

Ms. Kidd had told Mr. Jackson that they needed to act tough when VM arrived because that is part of the "game" – a word used by prostitutes and used by VM in her interview with the SF Police Department.  According to VM, "It's not hard to know the game.  It's not hard, it's just common sense. … I'm smart.  All I have to do is observe and I got it, probably better than the person doing it."  VM confirmed to the police that Kidd had introduced Mr. Jackson into the "game."  The prostitute wants her pimp to be an authority figure and powerful.  Thus, the show of force – which Ms. Kidd taught Mr. Jackson – is part of the game.  VM recognized and admitted to police her participation in this game that she said she taught herself to play "better than the person doing it."

When VM entered the hotel room, Jackson shoved her onto the bed.  She rolled off and fell on the floor.  Mr. Jackson then woke up Ms. Kidd, who was sleeping because she had been drinking heavily the night before.  Kidd then hit VM several times because she believed that VM had not answered her questions quickly enough.  VM did not scream out or cry.  Ms. Kidd pulled off VM's clothes and told VM to take a shower, which VM did.  VM then gave Mr. Jackson oral sex and had consensual intercourse with him.  Ms. Kidd got angry when she thought Mr. Jackson had ejaculated inside VM and hit VM several times.  In her police interview, VM confirmed that series of event, saying that Kidd thought Jackson "busted in me, but he didn't, he pulled out, and kind of let it go on the floor or whatever."  Ms. Kidd and VM then had sex with each other, after which they took a shower together.

Afterwards, VM told Kidd and Jackson that she had come from Merced with her "best friend" (a male) and that she had been working as a prostitute on First Street in San Jose – a well-known place to find a prostitute. http://www.mercurynews.com/news/ci_21649448/rally-decries-uptick-prostitution-along-s-first-street ("A crowd of about 90 dwindled to about half-strength as it moved seven blocks down South First Street Thursday evening, but shouts of "no more prostitution"

1   remained loud for the duration ….").  VM's text messages confirm that she was working on First

2   Street at the time she met Ms. Kidd and Mr. Jackson.

3          She told Ms. Kidd and Mr. Jackson that she had sex with her best friend's step-father, and he

4   taught her the basics of the escort business.  She would tell clients that she was 19 years old – as she

5   had done in the myRedBook ad to which Kidd and Jackson responded.  She said that she wanted to

6   leave Merced because she was "tired" of it.  VM said that she would stay with Kidd and Jackson as

7   long as they bought her "weed."  She told them that she regularly took ecstasy, cocaine, and crystal

8   methamphetamine.

9          VM confirmed to the SF police that she had been working as a prostitute in San Jose and that

10  she was with a male friend when she and Jackson corresponded based on her myRedBook ad.

11         The text messages on VM's telephone from April 6, 2013 show her sending numerous text

12  messages to her customers just before Jackson contacted her.  For example, at 2:09 p.m., she texted

13  "Alex San Jose" and wrote, "Hi this is honey I was wondering if you would like to schedual [sic] an

14  appointment."  At about the same time, she sent text messages to her friend Tiana saying that she had

15  to "deal with all of this bullshit" and then explained that it was "guy shit.. And my family … My

16  mom is telling me to go screw my self and that im a fuck up and worthless."

17         VM then texted the same solicitation message she had sent earlier to "Alonzo San Jose,"

18  "Arabian," "Brad San Jose," "Bryan San Jose," "Call," "Carlos 2 San Jose," "Carlos San Jose,"

19  "Chino San Jose," "Chris San Jose," "Danny San Jose," "David San Joe," and "Dayon San Jose":

20  "Hi this is honey I was wondering if you would like to schedual [sic] an appointment."  "Chino San

21  Jose" asked "How much again," and VM responded, "60 quicky 80 half hr."

22         The FBI failed to interview any of VM's customers or other pimps – before and after her time

23  with Kidd and Jackson – to find out any information about her, her business, whether she worked

24  with pimps before working with Kidd and Jackson, and her history of exaggeration, running away

25  from home, and engaging in prostitution.

26         The three slept in the hotel room that first night.  The next day, April 7, they discussed

27  creating a new myRedBook ad for VM.  Kidd began to create a new myRedBook page, and she gave

28  VM lingerie to wear for photos.  VM put on the lingerie and posed for pictures that Jackson took with

Kidd's iPhone.  After the ad was posted, a customer called and said he wanted to see her.  Kidd stayed in the room with VM; Jackson left and went to the parking lot.  He then heard a scream and returned to the room.  Ms. Kidd told Jackson that the customer attacked VM.  Jackson looked for, but could not find, the person.  VM said the customer tried to hurt her, and Jackson said he would protect her – exactly the reason VM chose to remain with Ms. Kidd and Mr. Jackson.  The three then went to a local Burger King; the customer kept sending texts to Kidd's iPhone.  (The FBI never tried to recover that evidence.)

VM confirmed this in her account to the SF police:  "He [the customer] came in, I asked him for the money.  I forgot how much it was.  He went to the bathroom.  When he came out of the bathroom, he said I can't do this.  Before he left, I said to him you need to give me something before you leave cause Mercedes and Jordan said that if you don't have something before you leave, the trick is going to get hurt or robbed or you're going to take the mistake and problems.  So he didn't give me any money and he tried to run out the door, and I tried to hold the door shut, and Mercedes came out from the bed, and he got even more scared and he was yelling help me.  He got out of the room, and Jordan went looking for him."

After that first day, VM, Kidd and Jackson traveled to various hotels in the Bay Area together, staying in the hotels for one or two nights, answering text messages from potential customers, and then setting up appointments for VM.  In all, they stayed at the Sunnyvale Motel 6, The Terrace in El Cerrito, the Premier in Concord, the Executive Inn in Antioch, Pleasant Hill Inn in Pleasant Hill, and the Motel 6 in SF.  Although most of these hotels had security cameras, with the exception of the Executive Inn, the FBI provided no analysis to of them – either to show that VM acted voluntarily (which was *Brady* material) or otherwise.

At each location, VM saw about 3-4 customers each day that she worked, though sometimes customers did not show up, and VM simply stayed in the room alone – sometimes for up to two hours.  (VM confirmed to SF police that she earned $2500 during the two week period, which is an average of about 3 customers per day at $60 per customer.)

On April 8 and 9, Kidd showed Jackson photos on her phone of VM and Kidd kissing.  (In her statement to the police, VM confirmed that account, saying that Kidd had posted them on her

Instagram account).  They left Sunnyvale and took BART to the Terrace in El Cerrito.

Prior to seeing customers at the Terrace, Mr. Jackson left the hotel and went to local stores. After the customer called, Ms. Kidd left the room, sometimes with Jackson.  Each time Kidd and Jackson left, they would stay away for 30, 60, or 90 minutes.  When they came back, VM was typically watching TV.  VM gave Jackson the money after each customer, though she told police that she kept some money for herself.

On April 10 (Wednesday), VM, Kidd and Jackson took BART to Concord, and then a taxi to the Premier hotel.  VM again had several customers during the course of the day.  While in Concord, the three ate out together at Las Montanas in Concord.

On April 11 (Thursday), Jackson went by himself to Antioch to meet a person to buy drugs. He was gone 3 to 4 hours.  That is confirmed again by VM's statement to the police about their drug use:  "Someone through Jordan…. He would always leave and come back and leave me with her. … We used the BART every time.  He had people come and pick him up or take the bus or BART to take him out of town to go pick it [drugs] up."  When Jackson returned, VM and Ms. Kidd were wearing towels and had methamphetamine, which Jackson believed VM got from a customer.

On April 12 (Friday), at about 12 pm, Kidd, VM and Jackson took BART to San Francisco. They went to the Motel 6 on Geary Street.  Kidd and Jackson had stayed there before and registered in Kidd's name.  VM again saw a number of customers during the day – during which time Kidd and Jackson were not in the room.

On April 13 (Saturday), the three took BART and returned to the Terrace hotel.  They stayed until Monday, April 15, when they then travelled together (again on BART) to Antioch.  In Antioch, Jackson and VM went to the Dairy Queen while Kidd was registering for the room.  Kidd met them and said she wanted food.  Kidd and Jackson then walked to buy food, brought it back to the hotel, and the three then ate in the room together.

Ms. Kidd, VM and Mr. Jackson stayed together in Antioch on April 16, and on April 17 and 18 stayed at the Pleasant Hill Inn.  The management at the Pleasant Hill Inn told Kidd, VM, and Jackson to leave the hotel because there were too many people in the room.  According to VM, "because the second day, the guy [the desk clerk] kept harassing us and calling, and said 'the guy that

1   you're with needs to leave and there are way too many people [customers] coming up to the room.'

2   … I think he [the desk clerk] already kind of figured that I was working."   "In order to get back

3   inside the Pleasant Hill Inn, Jordan and me climbed in through the back window, … so the [clerk]

4   didn't see us."

5        At that point, Ms. Kidd and VM were not getting along well because Ms. Kidd thought VM

6   had a "smart" mouth.  Mr. Jackson told VM that she should start thinking about leaving.

7        Throughout the two week period, VM gave a portion of the money she earned to Mr. Jackson

8   and kept some of the money for herself.  In her statement to the police, VM confirmed that, "when I

9   was doing the dates, she [Kidd] told me to start pocketing money, by taking money out of the money

10  to give Jordan to give her.  There was almost $500 by the end of every trick that I got extra cash

11  from, I put in her suitcase and Jordan got the rest of it."  Jackson did not spend money they earned on

12  himself and instead only spent money on food for the three of them, hotel rooms, personal items,

13  clothes for VM and Kidd, and, on one occasion, a manicure for Kidd.  VM confirmed to the police

14  that she purchased sandals at Ross.

15       On April 20 (Saturday), Ms. Kidd, VM and Mr. Jackson left the Pleasant Hill Inn and took

16  BART into San Francisco, stopping at the MacArthur station, to try to buy marijuana and ecstasy.

17  While Mr. Jackson was looking for his drug contact, Ms. Kidd found someone to buy drugs from.

18  The three then continued on to San Francisco, got off at Powell Street, and walked to the Motel 6 on

19  Geary.  Mr. Jackson checked in, carried bags up to the room, and then the three went to Blondie's to

20  eat and to Aldo (a shoe store) at which Kidd bought shoes.

21       When the three returned to the hotel room, Ms. Jackson called a number from a myRedBook

22  ad, and a young woman named Krystal came to the room.  The four of them took ecstasy and snorted

23  methamphetamine.  At about 5:00 pm, two police officers knocked on the hotel room door.  Mr.

24  Jackson climbed out of the window because he was high on drugs and because he was concerned

25  about being found with drugs.  As he tried to climb down a pipe attached to the building, the pipe

26  broke and he fell from the third floor to the second floor – about 40 feet.  He then walked back into

27  the hotel and took the elevator down to the first floor, where he met the police in the lobby.  They

28  then accompanied Jackson back to the hotel room.  The police asked Krystal if she was alright

1  (because her friend-pimp (Nathanial Knapp) had complained to police that she had gone into the

2  room).  She said she was alright and that she did not want to leave.  VM did not complain to the

3  police, nor did she ask to leave with them.  The police then returned with a cell phone from Knapp

4  and gave Krystal the phone.

5         Two or three hours later, the police returned and said that Krystal had to leave because her

6  father had called and said that she was a minor.  Krystal left, along with VM because VM had no

7  identification.  The police took telephones from Mr. Jackson's jacket.  They issued tickets to Kidd

8  and Jackson for contributing to the delinquency of a minor.  They later returned and arrested Kidd

9  and Jackson.

10  **IV.    The Parties' Stipulation Reflects the Facts Upon Which the Sentence Should be Based**

11         The parties agreed on the facts to which Mr. Jackson admitted:  "Between April 6, 2013, and

12  April 20, 2013, I knowingly conspired with Mercedez Kidd in the Northern District of California to

13  recruit, entice, harbor, transport, and maintain V.M., in or affecting interstate commerce, in reckless

14  disregard of V.M.'s true age.  As part of this conspiracy, I intended that V.M. would and did engage

15  in commercial sex acts.  During our initial meeting on April 6, 2013, Kidd and I both used physical

16  force against V.M.  Also during the initial meeting, I had sexual intercourse with V.M., and Kidd

17  orally copulated V.M. and ordered V.M. to reciprocate.  I agree that V.M. was 16 years old at the

18  time of this offense."  Mr. Jackson further admitted that he used a computer to post images of VM

19  and he and others used particular cell phones as part of the conspiracy.

20         The parties disagreed over whether a guideline adjustment for "undue influence" should

21  apply.

22         After reaching the agreement on the facts, and after Mr. Jackson entered his guilty plea

23  pursuant to that agreement, the government disclosed an FBI interview report of VM that included

24  allegations that Mr. Jackson held VM against her will, kidnapped her, and raped her repeatedly.  The

25  PSR incorporated those allegations into the final report as though they were true, but they were not

26  the true facts here.

27         Fact stipulations in plea agreements are a proper basis for the Court to determine the relevant

28  facts for sentencing purposes, even though the Court is not bound by stipulations.  As the

commentary to USSG 6B1.4(d) states, a court should "consider the stipulation, together with the results of the presentence investigation, and any other relevant information."  Where the parties stipulate to particular facts, the defendant is entitled to have the plea agreement read in his favor.  See *United States v. Lee*, 725 F.3d 1159, 1167 (9th Cir. 2013) ("[A]ny ambiguity is read against the government….  We conclude that, at the time of making her plea agreement, Lee factually stipulated only to having transported 3 KG of methamphetamine and that she did not admit to any purity level.  Consequently, applying the 38–level provision in sentencing Lee constituted procedural error.")

The Court may reject the stipulation only when a *neutral* presentence *investigation* determined facts other than those to which the parties stipulated.  *See United States v. Mason*, 961 F.2d 1460, 1462 (9th Cir. 1992) ("Based on *Howard* and section 6B1.4, we hold that the district court was free to reject the stipulation in light of the true facts set forth in the presentence report."); *United States v. Horvath*, 492 F.3d 1075, 1078-79 (9th Cir. 2007) (the probation officer acts at the direction of the court, as a neutral information-gathering agent of the court.").

Here, however, the probation officer merely repeated the allegations made to the government, through selected hearsay statements of VM.  VM declined to be interviewed by the probation officer, while Mr. Jackson not only agreed to be interviewed, but also offered to be re-interviewed after the draft PSR was released about what happened during the two week period when Ms. Kidd, VM and he were together.

The probation officer was unable to question VM and other witnesses about things that go directly to whether the "offense conduct" reported in the PSR is accurate, such as the following examples:

1.     No family member or friend (including the friend/pimp she was with in San Jose when she met Ms. Kidd and Mr. Jackson) ever reported that VM was missing.

2.     Physical exams of VM by law enforcement agencies immediately after Mr. Jackson's arrest revealed no evidence of physical trauma or sexual abuse despite her claims of repeated and recent physical and sexual abuse.

3.     There was no DNA evidence of Mr. Jackson on VM or her clothes despite her claim of having had sex with Mr. Jackson multiple times.

1       4.    VM never told any customer, hotel clerk, hotel maid, restaurant server, store clerk, or

2  BART employee or police officer – all places she admitted she travelled to – anything about her

3  supposed condition, even though she was left alone in various hotel rooms for hours at a time.

4       5.    VM never left, even though she admitted to police that Ms. Kidd told her to leave.

5       6.    VM left at one point and then, by her own admission, she came back to be with Ms.

6  Kidd and Mr. Jackson.

7       7.    In her interview with the police, VM refused to disclose the complete name of her

8  friend "Brandon" with whom she left home and travelled to San Jose, before meeting Mr. Jackson.

9       8.    In that same interview, VM refused to provide information about her Facebook

10  account to police, which would have shed light on her activities before and after the two-week period.

11       9.    VM had close to $500 in cash that she had kept from customer payments that would

12  have enabled her to leave when Ms. Kidd and Mr. Jackson were not with her.

13       10.    VM spent hours alone in various hotel rooms and never sought help from her friends,

14  her family, the police, a hotel clerk, or a customer.

15       11.    VM told the police that she knew the prostitution "game," she had taught it to herself,

16  she had cash, and she was very smart – resources that enabled her to walk away from Ms. Kidd and

17  Mr. Jackson, if that was what she wanted to do.

18       12.    VM claimed to have been forced to take drugs, yet admitted that she used

19  methamphetamine and other drugs before meeting them and after the two-week period together.

20       Academic research has found that most customers of prostitutes are not misogynists who do

21  not care for the women they meet.  Clients are "'repulsed by the idea of buying sex from prostitutes

22  who are desperate, vulnerable, or coerced into prostitution' and say *if they met a trafficked victim*

23  *they would try to help her escape or contact the police*."  Weitzer, *Legalizing Prostitution:  From*

24  *Illicit Vice to Lawful Business* 20 (NYU Press 2012) (emphasis added).  Customers complain about

25  violence against prostitutes and encourage others to treat them with respect.  *Id*.  The assertion that

26  VM had no means of escape, or person to whom she could at least complain, is therefore without

27  merit.

28       In addition to the lack of an independent investigation to support the assertions in the PSR, the

1  Court should not rely on allegations that are not facts found by the jury, because to do so would

2  violate Mr. Jackson's Sixth Amendment rights.  See *Apprendi v. New Jersey*, 530 U.S. 466 (2000);

3  *Alleyne v. United States*, 133 S. Ct. 2151, 2162, 186 L. Ed. 2d 314 (2013) ("When a finding of fact

4  alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent

5  part of a new offense and must be submitted to the jury.").

6      Recently, in *United States v. Guerrero-Jasso*, 752 F.3d 1186, 1191 (9th Cir. 2014), the Ninth

7  Circuit held that, "[w]hen a conviction is obtained through a guilty plea rather than a jury verdict, it is

8  the government's burden to seek an explicit admission of any unlawful conduct it seeks to attribute to

9  the defendant for *Apprendi* purposes" (quotations and citation omitted).  In a concurring opinion,

10  Judge Berzon explained that, "One would think that a constitutional protection designed to assure that

11  juries rather than judges decide facts essential to determining the potential maximum sentence could

12  never be satisfied by post-conviction evidentiary submissions, reviewed by a judge and directed at

13  demonstrating that *had* the submissions been introduced at a jury trial, a jury would have found the

14  facts in the government's favor beyond a reasonable doubt." *Id.* at 1197.  *See Gall v. United States*,

15  552 U.S. 38, 60, 128 S. Ct. 586, 602-03, 169 L. Ed. 2d 445 (2007) ("as I noted in *Rita,* the Court has

16  not foreclosed as-applied constitutional challenges to sentences. The door therefore remains open for

17  a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range,

18  would not have been upheld but for the existence of a fact found by the sentencing judge and not by

19  the jury.") (Scalia, J. concurring). Thus, this Court should not sentence Mr. Jackson based on facts

20  that were not part of the parties' agreement or based on hearsay assertions in the PSR.[2]

21

22      [2]  Some appellate courts have not accepted as applied Sixth Amendment appellate review as
explained by Justice Scalia and Judge Berzon, though (a) that does not prevent this Court from

23  protecting Mr. Jackson's right to be sentenced based on the agreed-on facts and (b) the issue arose in
different contexts.  *See United States v. Cooper*, 739 F.3d 873, 884 (6th Cir. 2014) ("even if *Alleyne*

24  extended to cover increases in the guidelines-recommended sentences, the opinion itself recognizes
that federal courts treat the fact of prior convictions differently than other facts that might trigger a

25  change in a defendant's minimum or maximum sentence.") (prior convictions); *United States v.
Nunez*, 13-1702, 2014 WL 2566099 (6th Cir. June 9, 2014) ("Contrary to Nunez's contentions, none

26  of these factual findings implicated either *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147
L.Ed.2d 435 (2000), or *Alleyne v. United States,* 570 U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314

27  (2013), because the findings did not change the statutory maximum or minimum.") (drug quantity);
*United States v. Charles*, 13-11863, 2014 WL 3031267 (11th Cir. July 7, 2014) ("a district court may

28  continue to make guidelines calculations based upon judicial fact findings and may enhance a

1    At the least, before the recent developments in sentencing law, the Ninth Circuit held that

2    facts that have an "extremely disproportionate effect on the sentence relative to the offense of

3    conviction" must be found by clear and convincing evidence.  *United States v. Berger*, 587 F.3d

4    1038, 1047 (9th Cir. 2009) (quotations and emphasis omitted) (citing *United States v. Restrepo*, 946

5    F.2d 654, 659-60 (9th Cir. 1991)).

6        In short, the stipulated facts are the facts upon which Mr. Jackson should be sentenced.  There

7    is no basis under USSG 6B1.3 to reject that stipulation.

8    **V.    The Proper Consideration of the Sentencing Factors**

9        Congress has chosen leniency over retribution in sentencing.  "The court shall impose a

10   sentence sufficient, *but not greater than necessary*, to comply with the [following] purposes":  (1) the

11   nature and circumstances of the offense, (2) the need for a sentence imposed (A) to reflect the

12   seriousness of the offense and provide just punishment for the offense, (B) to deter the defendant

13   from future misconduct, (C) to protect the public and (D) to provide the defendant with needed

14   educational or vocational training, medical care, or other correctional treatment in the most effective

15   manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range

16   provided for in the advisory guidelines; (5) pertinent policy statements of the advisory guidelines; (6)

17   the need to avoid unwarranted sentence disparities among defendants with similar records who have

18   been found guilty of similar conduct; and (7) the need to provide restitution to victims. 18 USC §

19   3553(a).

20       The application of section 3553 factors should lead to a potential reasonable sentence and not

21

22   sentence—so long as its findings do not increase the statutory maximum or minimum authorized by
     facts determined in a guilty plea or jury verdict.").

23       In *United States v. Fitch*, 659 F.3d 788, 795 (9th Cir. 2011), the Ninth Circuit upheld a

24   sentence that relied on facts establishing a crime (murder) different from that of conviction (fraud),
     but did not decide the "as applied" Sixth Amendment issue identified by Justice Scalia:  "In other

25   words, Congress is free, under current Sixth Amendment jurisprudence, to say that a jury must decide
     how much heroin a defendant sold, but that a judge may decide the far more significant question of

26   whether Fitch murdered his wife as a means to commit his crimes."  *See Criminal Law--Federal
     Sentencing--Ninth Circuit Affirms 262-Month Sentence Based On Uncharged Murder.--United States*

27   *V. Fitch, 659 F.3d 788 (9th Cir. 2011),* 125 Harv. L. Rev. 1860, 1867 (2012) ("the most compelling
     argument for allowing as-applied Sixth Amendment challenges is the perverse incentive created by

28   *Fitch* itself").

a disproportionate or unfair one.  In *United States v. Mohamed*, 459 F.3d 979, 986-87 (9th Cir. 2006), the court held: "whether the district court imposed a sentence inside or outside the applicable Sentencing Guidelines range, a reviewing court determines whether the sentence is reasonable."  *See also United States v. Booker*, 543 U.S. 220, 263-65 (2005).  In the context of reviewing sentences either above or below the punishment provided by the Guidelines, the *Mohamed* court reasoned that no matter how a sentence is calculated, either using strict adherence to the formulas of the Guidelines or employing a departure from that framework, the ultimate test is whether the sentence imposes a reasonable punishment.  "We think the better view is to treat the scheme of downward and upward 'departures' as essentially replaced by the requirement that judges impose a 'reasonable' sentence." *Mohamed*, 459 F.3d at 986.

The Ninth Circuit has held that *Booker* conferred broader (not narrower) discretion upon district courts to determine an appropriate sentence.  *See United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) (en banc), overruled on other grounds as recognized by *United States v. Munoz– Camarena*, 621 F.3d 967, 969 (9th Cir. 2010); *United States v. Plouffe*, 445 F.3d 1126, 1128 (9th Cir. 2006) ("*Booker* requires that appellate courts review the reasonableness of all sentences, which is informed by the Guidelines calculation as well as by the other factors set forth in § 3553(a)").

As the Court held in *Menyweather*, 447 F.3d at 634, "In the 'broader appraisal,' available to district courts after *Booker,* courts can now … have the discretion to weigh a multitude of mitigating and aggravating factors that existed at the time of mandatory Guidelines sentencing, but were deemed 'not ordinarily relevant,' such as age, education and vocational skills, mental and emotional conditions, employment record, and family ties and responsibilities."

The Second Circuit described the importance of judges using their own sense of what is fair in particular cases: "the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances.  That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness." *United States v. Jones*, 460 F.3d 191 (2d Cir. 2006).

Section 3553 lists the sentencing guidelines as one factor to be considered, though a

Sentencing Guideline sentence is not presumptively reasonable.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) ("The district court may not presume that the Guidelines range is reasonable. … Nor should the Guidelines factor be given more or less weight than any other."); *Nelson v. United States*, 129 S.Ct. 890, 891 (2009) (per curiam) (the guidelines are "not to be presumed reasonable"); *Peugh v. United States*,  2013 WL 2459523, 1  (U.S., June 10, 2013) (same).

The considerations that previously would have been part of a departure or variance analysis under the sentencing guidelines, when they were mandatory, must now be analyzed under section 3553, just as considerations rejected by the guidelines may properly be considered now.  *See United States v. Dallman*, 533 F.3d 755  (9ᵗʰ Cir. 2008) ("The district court's determination that Dallman's offense conduct was not aberrant behavior and did not merit a downward departure may be encompassed within the district court's assessment of Dallman's 'history and characteristics' as set forth in 18 USC § 3553(a)(1)"); *United States v. Schroeder*,  536 F.3d 746 (7th Cir. 2008) ("Although [t]he concept of departures has been rendered obsolete in post-*Booker* sentencing ... the district court may apply those departure guidelines by way of analogy in analyzing the section 3553(a) factors."); *United States v. Garcia*, 497 F.3d 964, 971-72 (9th Cir. 2007) (sentence vacated in part because district judge erred in holding it had no power to consider to defendant's drug addiction and resulting mental impairment as a mitigating factor under 18 USC § 3553(a):  "Just because a consideration was improper under the mandatory Guidelines regime does not mean that it is necessarily improper under the advisory Guidelines regime.". . .  Fact that guidelines preclude downward departure because of voluntary use of drugs under USSG § 5K2.13 and 5H1.4 does not preclude judge from using same as mitigating factor under § 3553(a)—"We agree with our sister circuits and hold that district courts are not prohibited in all circumstances from considering a defendant's drug addiction in choosing a reasonable sentence."); *United States v. McBride*,  434 F.3d 470 (6ᵗʰ Cir. 2006) ("Now, because the Guidelines are no longer mandatory and the district court need only consider them along with its analysis of the section 3553(a) factors, the decision to deny a Guidelines-based downward departure is a smaller factor in the sentencing calculus. Furthermore, many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court — with greater latitude— under section 3553(a).").

1    That is significant, because it means that the Court must look at the person, his background,

2  his particular conduct, the extent of his involvement in the criminal case, his personal circumstances,

3  and other section 3553 factors and decide on a reasonable sentence while also undertaking a

4  Guideline calculation.  No special weight may be given to the guidelines.  *See Kimbrough v. United*

5  *States*, 552 U.S. 85 (2007); *Gall*, 552 U.S. 38 (2007); *United States v. Amezcua-Vasquez*, 567 F.3d

6  1050 (9th Cir. 2009) (within-guideline sentence deemed substantively unreasonable).

7    A key component of Supreme Court law, designed to ensure that the guidelines are truly

8  advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of

9  policy.  Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from

10  Guidelines ranges] based solely on policy considerations, including disagreements with the

11  Guidelines."  *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United*

12  *States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails

13  properly to reflect § 3553(a) considerations").

14    If the Court disagrees with the policy underlying the guidelines applicable in a case, then it

15  may sentence outside of the guidelines.  See *Peugh v. United States*, 133 S. Ct. 2072, 2089 (2013)

16  (Thomas, J., dissent) ("a district court may freely depart from the range recommended by the

17  Guidelines based not only on 'an individualized determination that [the Guidelines] yield an

18  excessive sentence in a particular case,' but also based on '*policy* disagreement' with the Guidelines

19  themselves.") (citations omitted); *Pepper v. United States,* 131 S.Ct. 1229, 1247 (2011) ("a district

20  court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the

21  Commission's views."  That is particularly true when "the Commission's views [forbidding a

22  departure on this ground] rest on wholly unconvincing policy rationales not reflected in the

23  sentencing statutes Congress enacted."); *United States v. Mitchell,* 624 F.3d 1023, 1030 (9th Cir.

24  2010) ("As the Supreme Court through *Booker*, *Kimbrough*, and *Spears* has instructed … sentencing

25  judges can reject *any* Sentencing Guideline provided the sentence imposed is reasonable").

26    In sum, this Court must impose the lowest possible fair and reasonable sentence.  It should

27  calculate the guidelines, but it need not impose a guideline sentence if such a sentence would be

28  neither fair nor reasonable, nor yield the lowest possible sentence consistent with section 3553's

sentencing goals.  If the base offense level and guideline adjustments are not based on empirical

evidence or on a Congressional finding, or if it disagrees with any articulated policy supporting the

guidelines, then this Court need not consider them at all.  If there is no such policy – and the

guidelines are tethered to a factor that is inapplicable here (such as a mandatory minimum sentence

imposed by a different statutory violation) – then that is even more reason to reject the guidelines

calculation as a potentially fair sentence.

### The Analysis of the 3553 Factors

**1.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 USC § 3553(a)(1))**

In enacting the Sentencing Reform Act, Congress did "not favor[] one purpose of sentencing

over another," S. Rep. No. 98-225, at 67 (1983), except that rehabilitation was not to be a reason to

impose a sentence of incarceration. 18 USC § 3582 (court must consider section 3553 factors,

"recognizing that imprisonment is not an appropriate means of promoting correction and

rehabilitation").  Rather, "each of the four stated purposes should be considered in imposing sentence

in a particular case," and "one purpose of sentencing may have more bearing on the imposition of

sentence in a particular case than another purpose has." *Id*. at 68.  In choosing what kind of sentence

to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a).  *Id*. at 119.

"Whether [imprisonment] should be imposed when authorized is a question to be resolved after

balancing all the relevant considerations."  *Id*.; *see also United States v. Bridgewater*, 479 F.3d 439,

442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

The nature and circumstances of the offense and the history and characteristics of Mr. Jackson

are discussed above.

**2.     Need for Just Punishment in Light of the Seriousness of the Offense, 18 USC § 3553(a)(2)(A)**

*a.     The Seriousness of the Offense*

This was Mr. Jackson's only experience at acting as a pimp for a young woman who had

already chosen to be a prostitute.  He certainly should be faulted for failing to determine – at the

outset – that VM was younger than 18 years old.  But, he did not engage in the "human trafficking"

that Congress was most concerned about.  *See* H.R. CONF. REP. 106-939, 89 ("Section 2 of the House bill also includes findings to the effect that every year millions of people, predominantly women and children, are trafficked within or across international borders; that many victims are trafficked into the international sex industry, often through force, fraud, or coercion; that trafficking in persons is not limited to sex trafficking, but often involves forced labor and other violations of human rights; that trafficking is a growing transnational problem that is increasingly perpetrated by organized criminal enterprises; that existing legislation and law enforcement in the United States and abroad are inadequate to deter trafficking, bring traffickers to justice, and meet the safe reintegration needs of trafficking victims; that in some countries, anti-trafficking efforts are hindered by official indifference, corruption, and sometimes even official participation in trafficking; that trafficking in persons is a matter of pressing international concern, and that the United States must work bilaterally and multilaterally to abolish trafficking and protect trafficking victims.")

Instead, Ms. Kidd and Mr. Jackson chose an easy path to money, traveling from hotel to hotel, with VM, taking drugs together and earning money illegally.  Other than this crime, Mr. Jackson's criminal history has been largely self-directed and self-destructive, all crimes in which he misused illegal drugs and alcohol and committed minor offenses related to that substance abuse.  His relationship with Ms. Kidd, in which they both hit each other, was typical of the kind of dysfunctional relationship that arises when two people misuse drugs and alcohol and come from troubled backgrounds.

> ### b.   *Just Punishment*

Just punishment is not retribution.  Punishment without justice is retribution.  We have a system in which justice is dispensed by people who are not related to the offender and victim because we want an objective and dispassionate assessment of what the shortest sentence is consistent with justice and fairness.  The Senate Report described "just punishment" as follows:

> The first purpose listed is the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense." This purpose – essentially the 'just deserts' concept – should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.  From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the

1
2
offense. *From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.*

3
4
S. Rep. 98-225, 75-76, 1984 U.S.C.C.A.N. 3182, 3258-59 (emphasis added).

5
6
Mr. Jackson recognizes that his punishment will include a period of incarceration.  But that period of incarceration need not be lengthy for the punishment to be just.

7
8
9
10
11
12
13
14
15
Mr. Jackson may have to register as a sex offender, with the publication of that information to his family, the community, his friends, and his neighbors.  As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment.  For example, in *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008), the court held that a 30 month sentence for a 19 year old who had a sexual relationship with a 12 year old girl (who he met in an Internet chat room) was reasonable, in part because of the collateral consequences of being convicted as a sex offender.  *See United States v. Johnson*, 588 F. Supp. 2d 997, 1005 (S.D. Iowa 2008) ("He will be required to register as a sex offender, and he will face the accompanying severe restrictions on his liberty.").

16
**3.    General and Specific Deterrence (18 USC § 3553(a)(2)(B), (C))**

17
18
19
20
21
22
23
24
25
26
27
28
The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime.  *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P.

Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame.").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

A prison sentence no longer than 27 months will deter Mr. Jackson from re-engaging in the activity that led to his arrest. He has already spent a year in prison – having chosen not to contest his pre-trial detention because he recognized the significance of his conduct and that he ultimately should serve a prison sentence. *See United States v. Edwards*, 595 F.3d 1004, 1016-17 (9th Cir. 2010) ("We cannot find as a matter of law, however, that the failure to impose a sentence that includes a period of incarceration is a violation of § 3553(a) or inconsistent with the Sentencing Reform Act. We find no support for such a rule. Section 3553(a), for instance, does not require the goal of general deterrence be met through a period of incarceration. The district court explicitly considered, weighed and factored into its sentence the important goal of deterrence. We hold that its consideration of the deterrent effect of its sentence was not an abuse of discretion."); *United States v. Tomko*, 562 F.3d 558, 570 (3d Cir. 2009) ("On the one hand, probation was warranted because of Tomko's negligible criminal history, his record of employment, his community ties, and his extensive charitable works. On the other hand, the statutory maximum fine was necessary to effect deterrence in light of Tomko's wealth."); *United States v. Bogan*, 788 F. Supp. 433, 436 (N.D. Cal. 1992) ("Deterrence can often be

achieved as well by a fine if set at appropriate levels.  Because rehabilitation is probably more efficacious outside prisons, which appear to be breeding grounds for criminality, fines are probably a more desirable form of punishment than incarceration from that standpoint."), *vacated sub nom. on other grounds United States v. Robinson*, 20 F.3d 1030 (9th Cir. 1994) and *overruled on other grounds by United States v. Thompson*, 109 F.3d 639 (9th Cir. 1997).

### 4.    Educational and Vocational Training and Medical Care  (18 USC § 3553(a)(2)(D))

Mr. Jackson undoubtedly needs psychological and emotional counseling – two things that are more readily available outside of prison.  He needs drug counseling, and thus he joins in the recommendation of the Probation Department that the Court recommend him for the Residential Drug Abuse Treatment Program.

Section 3553 requires the Court to impose a sentence that will provide Mr. Jackson with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  Mr. Jackson already has a number of college credits; he intends to finish college and earn a B.A. degree.  In jail, he has completed the Relationship and Marriage Education course (a certificate of completion accompanies this memo).  While he recognizes that his criminal record will significantly interfere with his ability to obtain employment in certain fields, he intends to use his experience in ways that will help others avoid the problems he has had – which reveals an ongoing willingness to accept responsibility for his actions and past and to make amends.

The recommendations of Dr. Gregory make sense for Mr. Jackson – substance abuse treatment, psychotherapy, domestic violence classes, further college education, and vocational training.  All of those are better provided by facilities outside of prison.

### 5.    The Sentence Requested Meets the Purposes of Sentencing Under the Circumstances in this Case 18 USC § 3553(a)(3)

This Court is required to consider "the kinds of sentences available" by statute.  For Mr. Jackson's conviction under section 1594, Congress has provided for a range of "any term of years," which means that he is eligible for probation, see 18 USC § 3551(b).  "Congress thus not only envisioned, but accepted, the possibility that some defendants found guilty of that subsection of the

statute would receive no jail time at all." *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007) (upholding sentence of one day in prison followed by three years' supervised release where statutory range for drug trafficking was 0-20 years).

The Court is also authorized to impose a term of supervised release if a prison sentence is imposed, but the PSR states incorrectly that he must be sentenced to a term of at least five years and at most life if a prison sentence is imposed under 18 USC § 3583(k). That subsection does not refer to section 1594. Rather, section 3583(a) authorizes a supervised release term of a maximum of five years. *See* 18 USC § 3559 (classification of offenses).

Mr. Jackson concedes that he should serve a sentence of imprisonment, but he requests that the Court consider his unique circumstances in fixing that sentence. He falls outside of the core of offenders who abuse multiple victims or who operate for years or who coerce women with no criminal history into prostitution or trap women working as prostitutes in horrible conditions for years. Mr. Jackson found VM on myRedBook, spent two weeks with her, during which VM kept a significant portion of the money she earned, they ate out and went shopping together, they stayed in six Bay area hotels or motels together, and they lived together. Mr. Jackson's conduct was a far cry from the heartland of offenses for which section 1594 was adopted.

### 6. The Sentencing Range Provided For in the Advisory Guidelines (18 USC § 3553(a)(4))

The Court is required to consider the advisory guidelines, but it is not required to apply them, let alone apply them in the slavish manner proposed by the PSR. The PSR incorrectly adds two points for undue influence, the criminal history calculation overstates Mr. Jackson's actual prior criminal conduct, and the PSR fails to consider factors that dictate against using the calculated guidelines to determine the sentence.

The Ninth Circuit recently said that "sentencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime," *United States v. Harris,* 679 F.3d 1179, 1183 (9th Cir. 2012).

The Court's analysis should focus on the factors of section 3553 other than the sentencing

guidelines:  who is Jordan Jackson, why did he get involved with a minor prostitute, how did the crime to which he pled guilty come about, and how best can the judicial system treat him so that he is rehabilitated and does not re-offend?  Only after that initial judgment is made should the Court look to see whether the guideline calculation helps in fixing the sentence.  We contend that they do not because there is nothing in their calculation other than an artificial base offense level fixed because of a Congressionally mandated minimum sentence for an earlier version of the statute and the addition of points based on superficial facts.

 a.  The Base Offense Level is Not Reasonable or Reliable

When the base offense level for a guideline lacks an empirical basis and was driven instead by Congressional directive, the Court should be reluctant to apply it.  *See Kimbrough,* 552 U.S. at 109 (in cases involving application of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role," it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case."); *Gall,* 552 U.S. 38 (2007) n. 2 (noting that not all Guidelines are tied to empirical evidence).

In *United States v. Beiermann,* 599 F.Supp.2d 1087  (N.D. Iowa 2009), the court rejected child pornography guidelines altogether:  "Indeed, in light of *Spears,* I find that I may go one step further than simply concluding that the child pornography guideline, USSG § 2G2.2, is entitled to considerably less deference than other guidelines, in individual cases, because it is the result of congressional mandates, rather than the Commission's exercise of its institutional expertise and empirical analysis. I find that USSG § 2G2.2 should be rejected on categorical, policy grounds, even in a 'mine-run' case, and not simply based on an individualized determination that it yields an excessive sentence in a particular case."

The Sentencing Commission itself has admitted that tying a base offense level to a mandatory minimum is an inaccurate method to calculate sentences.  On March 11, 2014, the Committee on Criminal Law of the Judicial Conference of the United States noted that "[f]or decades, the Criminal Law Committee has expressed its belief that setting the Sentencing Guidelines' base offense levels irrespective of mandatory minimum penalties is the best approach to harmonizing two competing

1   approaches to criminal sentencing." http://www.ussc.gov/sites/default/files/pdf/amendment-

2   process/public-comment/20140326/public-comment-CLC.pdf .

3          The base offense level for human trafficking (about which analysts have produced critical

4   examinations "questioning many of the popular claims (including the magnitude of the problem) and

5   identifying serious flaws in the data used to support those claims," Weitzer, *supra*, at 63) ranges from

6   24 to 34 under 2G1.3.  These are high – someone with no criminal history faces five years (or more,

7   depending on whether he used a computer or whether other adjustments exist).

8          Why 24 or 34?  Because these base offense levels were tethered to the statutory mandatory

9   minimum sentences of sections 1591 and 2422 of Title 18.  For example, section 1591(b)(1)

10  mandates a minimum sentence of 15 years in prison and USSG 2G1.3(a)(1) fixes the base offense

11  level at 34 (which carries a sentence of 12.5 to 15.5 years for Category I offenders).  The base offense

12  level for conspiracy is 24, which was the base offense level set when the mandatory minimum

13  sentence was five years.  *See* USSG Appendix C, Amendment 664 at 60 ("Third, this amendment

14  creates a new guideline, §2G1.3 … to specifically address offenses under chapter 117 of title 18,

15  United States Code ….  This new guideline has a base offense level of level 24 to account for the new

16  mandatory minimum terms of imprisonment established by the PROTECT Act."); Amendment 701

17  (adding levels 34, 30, and 28 to accommodate new congressional mandatory minimum sentences

18  required by section 1591).

19         The base offense levels, and statutory mandatory minimums, are the direct result of the

20  influence of one set of viewpoints in the United States:  organizations that "seek to criminalize not

21  just coercive sex trafficking but all migration into sex work.  These … organizations have

22  increasingly monopolized the trafficking debate …."  Weitzer, *supra*, at 63.  This viewpoint held

23  sway during the George W. Bush administration, linking prostitution to trafficking, *id*. at 64, and was

24  behind the legislation that blurred the line between prostitution and trafficking, *id*. at 69.  The legacy

25  of those laws and the sentencing guidelines meant to implement the laws remains:  the "now fully

26  institutionalized legislation, agencies, and enforcement machinery will remain firmly in place for the

27  foreseeable future."  *Id*. at 71.

28         In practice, courts regularly choose not to follow the guideline calculation in conspiracy cases

27          JACKSON'S SENTENCING MEMO
            Case No.: 13-CR-00363 EMC

such as this one.  According to Sentencing Statistics, LLC, a sentencing analytics company, the U.S. Sentencing Commission datafile for fiscal year 2012 reveals that there have been 14 sentences where USSG 2G1.3 was applied to a conspiracy charge (18 USC 1594).  Of those 14 sentences, the average sentence was 27.7 months, the median sentence was 30 months, and five defendants were sentenced to probation.  *See* U.S. Sentencing Commission datafile for fiscal year 2012 available at http://www.ussc.gov/research-and-publications/commission-datafiles.

Thus, there is no good reason to apply the sentencing guidelines to Mr. Jackson, and to do so would undermine the other section 3553 factors.  Mr. Jackson was not a human trafficker in the sense that Congress intended.  He did not create an organization that lured women into slavery; he and his girlfriend called an underage prostitute who advertised her services on a well-known prostitution website and claimed that she was 19 years old.  The guidelines do not consider situations where the minor involved in the conspiracy was a prostitute before she met the defendants and where she chose to work with Ms. Kidd and Mr. Jackson.  The Guidelines do not account for people like Mr. Jackson, who himself was addicted to drugs and alcohol, acted under the influence of emotional and psychological problems, and lurched into the "game" of prostitution and pimping.

In short, while this Court should give "respectful consideration" to the guidelines, Mr. Jackson's sentence should be based on the "other statutory concerns."  *Kimbrough*, 552 U.S. at 101. The guideline sentence recommended by the Probation Department is not reasonable.

      b.    <u>The Two Point Upward Adjustment for the Use of A Computer Results in an Unreasonable Potential Sentence</u>

The guidelines require a 2 point upward adjustment for Mr. Jackson's use of a computer.  In an analogous context, the Sentencing Commission reported to Congress that upward adjustments in the guidelines based on the use of computers fails to differentiate among offenders because computer use is ubiquitous.  *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"] at iii, xi, 209, 323.

The base offense level coupled with the computer adjustment push Mr. Jackson's guideline range into a stratospherically high prison sentence range without any consideration of his personal characteristics, how his crime compares to those of other offenders, and what actually happened in

1  his case.

2            c.     The Undue Influence Adjustment Does Not Apply

3         Jackson did not force or intimidate VM into staying with them; VM agreed to stay in

4  exchange for drugs.  VM lied about her true age on her internet advertisement.  She had no

5  identification that revealed her age when she joined Jackson and Kidd, and she admitted to police that

6  she never told any of her customers that she was 16 years old.  In fact, she told the police that several

7  customers asked her if she was 19, and she lied and told them that she was.

8         Shortly after Ms. Kidd and Mr. Jackson were arrested, the police interviewed VM several

9  times – and unlike the FBI, they tape recorded the interviews.  (The government turned over a second

10  audio tape interview and a videotaped interview of VM on June 10, 2014).  During one interview,

11  VM told the police that she left Ms. Kidd and Mr. Jackson, and came back.  In response to a police

12  question whether Ms. Kidd ever suggested that VM "walk away," VM stated, "Yes.  I came back

13  because I didn't know what to do.  I could have ran.  I could have gone away but I didn't."

14         The undue influence adjustment does not apply.  The cases that have applied the adjustment

15  involved someone with a family or other familial type relationship or used much greater force to

16  maintain the relationship, such as *United States v. Smith*, 719 F.3d 1120, 1125 (9th Cir. 2013)

17  ("Smith took steps aimed at making M.S. dependent on him: knowing she was homeless and lacking

18  family support or financial resources, he invited her to move in with him, gave her a job, and began a

19  sexual relationship with her. These predatory acts compromised the voluntariness of her ability to

20  resist Smith's demands that she work as a prostitute for him."); *United States v. Brooks*, 610 F.3d

21  1186, 1199 (9th Cir. 2010) ("When R.O. and N.K. encountered Brooks and Fields, the girls had no

22  money, no job and, as runaways, nowhere to live. Fields showed R.O. a large sum of money and told

23  her that if she worked for him she would travel, be paid, and have a good life, and that N.K. could

24  come, too.  Brooks, after learning that R.O. and N.K. had run away from a juvenile detention center,

25  also suggested that the girls go to San Diego to work for Fields as prostitutes. *Neither of the girls*

26  *had engaged in prostitution before meeting Brooks and Fields*.") (emphasis added).

27         The facts here are different from those in the cases where undue influence was found.  VM

28  was a prostitute at the time she met Ms. Kidd and Mr. Jackson; it appears she has continued to engage

in that illegal conduct.  She used drugs before and after her time with Ms. Kidd and Mr. Jackson; she admitted to police that she was kicked out of school for using drugs.  She also admitted to the FBI that she began prostituting when she was 16 years old, she has used methamphetamine, cocaine, crack, marijuana and alcohol, and that she used methamphetamine after Mr. Jackson was arrested.  In these circumstances, the two point upward adjustment does not apply.

        d.    <u>The Criminal History Calculation Is Overstated</u>

The PSR guideline calculation also fails to reflect the overstatement of Mr. Jackson's criminal history.  Before this case, Mr. Jackson was involved in minor criminal activity.  The criminal history guideline calculation significantly overstates Mr. Jackson's criminal history and distorts the ultimate guideline calculated by the probation department.

On August 6, 2009, Mr. Jackson pled guilty to misdemeanor theft, which involved the theft of about $800 to $1000 worth of school books at Cal State East Bay, which Jackson was attending at the time.  When he was caught, the school did not expel him and instead allowed him to continue to attend school.  He was ordered to pay restitution and was placed on unsupervised probation.

After Mr. Jackson outlined the facts as he recalled them in response to the draft PSR, the Probation Department then obtained police reports (which it refuses to provide copies of to the defense), and summarized the case (PSR ¶38).  While the PSR purports to respond to Mr. Jackson's version of events, it does not, and cannot, dispute the essential facts:  he was placed on probation at the school, he was not expelled, and he was authorized to return to school.  He did not ultimately return to school because he lacked financial resources.

On December 26, 2009, Mr. Jackson pled guilty to petty theft after he shoplifted at Macy's at Christmas time and was caught.  He was given an appearance ticket.  Even though the date of his court appearance had not yet arrived, a warrant was issued for him, and he was arrested.  He was detained for about 2 weeks, with no court appearance or lawyer during that time, and then appeared in court.  He was placed on unsupervised probation.  He does not believe he was jailed for 10 days; the criminal history sheet provided by the government appears to reflect a "1 day work program."

On December 12, 2010, Mr. Jackson pled guilty to driving without a license.  After he was pulled over by police, he was given a ticket and allowed to drive away.  Section 4A1.2(c) of the

USSG provides that driving without a license should not be counted unless a term of probation of over one year was imposed.

On July 26, 2011, Mr. Jackson pled guilty to a minor drug offense.  He had taken a bus from El Cerrito to Vallejo to meet a friend.  When he got off the bus, police stopped and searched him, thinking he might have been involved in a car burglary – an offense he did not commit.  They found personal use amounts of drugs and a gun.

Finally, on October 29, 2012, Mr. Jackson pled guilty to domestic violence.  The offense arose from a physical altercation between Jackson and Kidd.  While they were on BART together, Jackson told Kidd that she was manipulative.  Kidd, who has a volatile temper, punched Jackson in the side of the head.  The two then got off BART and were walking in the parking lot, arguing loudly.  A passerby notified police, who came and handcuffed Jackson.  The police then interviewed Kidd who said they were just having an argument.  Jackson was released about 72 hours after his arrest.  He was thereafter arrested on a warrant, and Kidd posted bail for him.  Jackson does not believe he was sentenced to 60 days in jail.  Rather, he was sentenced to attend domestic violence classes and, before his arrest in this case, had attended 7 of the 8 classes.

The calculation of Mr. Jackson's criminal history category is thus based in part on three misdemeanor convictions (theft, shoplifting, and driving without a license), which added three criminal history points.  These were minor offenses.  Driving without a license is expressly excluded under USSG § 4A1.2(c).  The other two are of a similar petty nature, for which Jackson received only 20 and 10 days in jail.  In addition, all three were committed in a relatively short period of time when Jackson was only 22 or 23 years old.  *See United States v. Bowser*, 941 F.2d 1019, 1024 (10th Cir. 1991) (criminal history calculation reduced where offenses were committed close in time, defendant was young, and concurrent sentences were imposed).  Unlike the defendant in *Bowser*, Jackson received no prison sentence for any of these three misdemeanors.

The criminal history calculation is also based on an additional 2 points each for a drug offense and a domestic violence offense.  Jackson was sentenced to probation for each.  Clearly, the state prosecutor and judges determined that the offense conduct did not warrant a prison sentence and instead imposed probation and, with respect to the latter offense, required domestic violence classes.

Jackson was attending domestic violence classes at the time of his arrest in this case, and the PSR should reflect that attendance. Jackson faces a violation of probation hearing for that offense. *See generally*, *United States v. Sanchez-Rodriguez*, 161 F.3d 556, 564 (9th Cir. 1998) ("The lost opportunity to serve more of one's state term concurrent with one's federal term is a factor unmentioned by the Guidelines."). By analogy, USSG 3D1.2 requires grouping of closely related counts that involve substantially the same harm.

Finally, the PSR adds 2 criminal history points because Jackson was on probation for the domestic violence offense. In other words, the PSR adds 4 points (which alone would move Jackson into criminal history category III) for an offense that the state prosecutor and judge deemed worthy of probation with domestic violence classes – a far more reasonable approach to the problem than stacking points against Mr. Jackson. In addition, the approach constitutes double counting – adding multiple points for precisely the same conduct.

In situations such as this, courts regularly reduce the criminal history category applicable to a defendant to one that reflects a realistic judgment of his prior criminal conduct. *See United States v. Mishoe*, 241 F.3d 214, 219 (2d Cir. 2001) (reasons the criminal history may overstate seriousness of prior conduct "include, for example, the amount of drugs involved in Mishoe's prior offenses, his role in those offenses, the sentences previously imposed, and the amount of time previously served compared to the sentencing range called for by placement in CHC VI"); *United States v. Reyes*, 8 F.3d 1379 (9th Cir. 1993) (court upholds downward departure – 210 months to 33 months – from career offender guidelines – in both offense level and criminal category – where defendant had six minor drug and theft priors); *United States v. Brown*, 985 F.2d 478, 482 (9th Cir. 1993) (age at time of prior convictions and nature of those convictions – DUIs – are proper factors to consider in determining whether career offender status significantly over-represents seriousness of defendant's criminal history).

Thus, given the minor nature of Mr. Jackson's prior criminal conduct, the Court should fix his criminal history at 2 points (or Level II). That level sufficiently ascribes criminal conduct to Mr. Jackson for sentencing purposes. It is also important for the Mr. Jackson's classification. The Bureau of Prisons adds the number of points attributed to Mr. Jackson's prior criminal history to his

1    security classification.  The high number here will undoubtedly result in his designation to a medium

2    security level (and more restrictive) institution.  If the Court believes that the criminal history

3    category is overstated, then it should include a finding to that effect in the judgment and recommend

4    to the BoP that a lower security classification be applied to Mr. Jackson.

5          The sentencing guidelines for a level 25 (the adjusted guideline level without an increase for

6    undue influence), in a criminal history category of II, results in a guideline range of 63 to 78 months.

7    But that is only a rough starting point.  That guideline range does not take into account the unique

8    facts of this case, Mr. Jackson's personal characteristics (his psychological condition and his drug

9    and alcohol abuse), Mr. Jackson's likelihood of rehabilitation (as explained by Dr. Gregory), his

10   remorse, and the need to avoid unwarranted sentencing disparities. Moreover, the sentencing

11   guidelines as calculated by the probation department do not result in a potential range that properly

12   addresses the facts here.  Ms. Kidd and Mr. Jackson certainly acted in violation of the law, but their

13   conduct was not of the quality or quantity that the human trafficking statute was intended to punish

14   harshly.  Given the primarily voluntary nature of the interactions among the three participants in

15   these events, the guideline range is simply too harsh.  *See Kimbrough*, 552 U.S. at 111 (district court

16   "may determine...that in the particular case a within Guidelines sentence is 'greater than necessary"

17   to serve the objectives of sentencing"; here district court's below guideline sentence in drug case not

18   unreasonable because "it appropriately framed its final determination in line with §3553(a)'s

19   overarching instruction to 'impose a sentence sufficient, but not greater than necessary to accomplish

20   the goals of sentencing").  As the Supreme Court held in *Pepper v. United States*, 131 S.Ct. 1229,

21   1240  (2011), "the principle that 'the punishment should fit the offender and not merely the crime.'"

22   (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

23                    e.    Remorse and Acceptance of Responsibility

24         Mr. Jackson's acceptance of responsibility is no better demonstrated than his decision not to

25   contest pre-trial detention – despite having parents who obviously care deeply about him (and who

26   submitted a letter to the Court).  The overall sentencing goal is to impose the shortest sentence

27   possible consistent with justice for all.  A long prison sentence here would violate that admonition

28   because it would penalize Jackson in the same way that sophisticated human traffickers are penalized

1  – and punish him for conduct that he did not commit.

2      It is also important to consider what Mr. Jackson said – extemporaneously – to the Probation

3  Officer during his interview.  He did not read something he or his attorney previously wrote; he

4  spoke about his true regret and shame for what he had done:  "it is shameful what I did and I do not

5  want it to reflect on my parents.  They never raised me to be that way."  He did not express self-pity,

6  but rather expressed concern about VM and Ms. Kidd:  "I know my behavior has traumatized the

7  victim, caused my codefendant to lose her freedom, and has affected everyone's family."  See *United*

8  *States v. Jones*, 997 F.2d 1475, 1477 (D.C. Cir. 1993) ("Since long before the Guidelines, the law has

9  allowed sentencing judges to show leniency to defendants who demonstrate contrition and acceptance

10  of responsibility for their crimes.").

11      Those expressions of concern for others demonstrate a significant acceptance of responsibility

12  for the feelings of others, rather than his own.  For section 3553, the Court is not concerned with a

13  number of points that may reduce a guideline calculation, but rather is concerned with how to

14  sentence someone who has seriously recognized his own faults and expressed a desire to make up for

15  what he has done.

16      **7.      The Need to Avoid Unwarranted Sentence Disparities Among Defendants  (18**
        **USC § 3553(a)(6))**
17

18      It is important that there not be a significant disparity in the sentences imposed on Ms. Kidd

19  and Mr. Jackson.  The evidence is clear – both from Mr. Jackson's statements and VM's statements

20  (as well as other witnesses' statements) that Ms. Kidd and Mr. Jackson were partners in the pimping

21  business. After she met Mr. Jackson, Ms. Kidd explained how the "game" was played, she

22  participated in recruiting VM and taking photos of VM to post on myRedBook, and helped VM

23  reserve some of the money she earned as a prostitute.  Both Ms. Kidd and Mr. Jackson were

24  convicted of the same crime, with the same basic fact stipulation; both initially roughed up VM when

25  they met her.  Ms. Kidd taught VM aspects of the "game," according to VM.  Both Ms. Kidd and Mr.

26  Jackson were abusing drugs and alcohol during the events leading to their arrests.  Both were

27  involved in a physically abusive relationship in which they each hit or verbally abused the other.

28  Both benefited financially from their crimes.

1    In these circumstances, where there is no significant difference in their backgrounds, mental

2    health, emotional maturity, and offense conduct, there is no reason to treat Ms. Kidd and Mr. Jackson

3    differently in sentencing.

4    In addition, the Court should consider that this was a state court prosecution and it was

5    indicted federally only after having been charged by state prosecutors.  There was no federal

6    investigation; there was no FBI operation that suspected Ms. Kidd and Mr. Jackson were engaged in

7    "human trafficking" – the crime that Congress federalized and that is supposed to address domestic

8    and international organizations that traffic in human beings and prostitution.[3]  *See* Smith, *Human*

9    *Trafficking and RICO*, 18 Geo. Mason L. Rev. 759, 763 ("These victims are often lured away from

10   their homes with promises of a better life and superior work in a foreign country.  Yet, when they

11   arrive, they are subjected to forced labor or sexual exploitation through involuntary servitude or debt

12   bondage.").

13   The impulsive decision to pimp for a person who had already chosen to be a prostitute pales

14   in comparison to cases that involved true human trafficking.  *See United States v. Daas*, 198 F.3d

15   1167 (9th Cir. 1999) ("Indeed, a central goal of the Sentencing Guidelines is to eliminate sentencing

16   disparity . . . .")  Thus, for example, a long prison sentence was deemed reasonable where the

17   defendant headed a large organization that lured minor women (who had not voluntarily chosen to be

18   prostitutes) from Mexico, forced the women to be prostitutes, and kept them in inhumane conditions,

19   and where the defendant's own comments at sentencing indicated that he did not understand the

20   seriousness of his offense.  *United States v. Cortes-Meza*, 411 F. App'x 284, 294 (11th Cir. 2011).

21   _____

22   [3]  The US Attorney's Manual Section 8-3.120 requires prosecutors to notify the Civil Rights
     Division of the Department of Justice and provide the following information before bringing the

23   charges brought here:  (a) identity of the targets of the investigation; (b) the factual allegations to be
     investigated; (c) the statutes which may have been violated; (d) the United States Attorney's

24   assessment of the significance of the case and whether the case is one of "national interest"; and (e)
     the United States Attorney's proposed staffing of the matter (including whether a Civil Rights

25   Division attorney should be assigned to work directly on the matter).  The United States Attorney is
     required to advise the Civil Rights Division as the case develops of new information relating to the

26   United States Attorney's assessment of the case and whether it is one of "national interest."

27   Jackson requested discovery of the foregoing reports as *Brady* material relevant to guilt or
     punishment on August 7, 2013 and no information was provided.  The absence of any notice or

28   reports strongly suggests that the case was not deemed significant by the USAO or the DOJ.

1        **8.      The Need to Provide Restitution  (18 USC § 3553(a)(7))**

2            The final consideration for this Court in fixing an appropriate sentence is "the need to provide

3    restitution to victims."  Mr. Jackson is indigent, but that fact should not enhance a prison sentence.

4    "Most relevant to the issue here is the holding in *Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26

5    L.Ed.2d 586 (1970), that a State cannot subject a certain class of convicted defendants to a period of

6    imprisonment beyond the statutory maximum solely because they are too poor to pay the fine."

7    *Bearden v. Georgia*, 461 U.S. 660, 664 (1983).

8        **9.      Prior Custody**

9            Mr. Jackson has already served over a year in custody for the offenses charged in this case.

10   That is already a significant punishment.  *See United States v. Miller*, 991 F.2d 552, 554 (9th Cir.

11   1993) (defendant has "already been punished to some extent" by pretrial home detention); *United*

12   *States v. Martin*, 363 F.3d 25 (1st Cir. 2004).

13                        **Objections to the Pre-sentence Report**

14           Mr. Jackson objects to the PSR's sentencing guideline calculation and the Probation

15   Department's recommendation, which is tethered to the guideline (and fails to consider the section

16   3553 factors).  In addition to the disputes outlined above, Mr. Jackson requests that the Court order as

17   follows:

18           1.      The offense conduct in the PSR should be modified to conform to the parties'

19   agreement.  Failure to correct the PSR will improperly increase Mr. Jackson's security level in the

20   Bureau of Prisons.

21           2.      There were no guns used during the commission of the offense.  Any references to

22   guns should be deleted from the PSR because the references may improperly increase Mr. Jackson's

23   security level.

24           3.      The PSR repeats an allegation contained in a police report that Mr. Jackson told police

25   that "Jackson indicated that he was an informant for another agency."  (PSR at 13)  That is false, as

26   well as irrelevant.  That should be deleted from the final PSR because the characterization of Mr.

27   Jackson as an informant may be detrimental to Mr. Jackson while in prison.

28           Mr. Jackson respectfully requests that the Court reject the "Recommendation" of the

probation department.

## **<u>CONCLUSION</u>**

For the reasons set out above, we respectfully request that the Court impose a sentence consistent with this Sentencing Memorandum and order that the portions of the presentence report to which the defendant has objected be deleted or modified.

DATED:  July 23, 2014                             BOERSCH SHAPIRO LLP


                                                              */s/  David W. Shapiro*
                                                           David W. Shapiro
                                                           Attorney for Defendant Jordan Jackson

# EXHIBIT 1

## FILED UNDER SEAL

# EXHIBIT 2

# Relationship and Marriage Education
## Certificate of Completion

*This is to certify that*

## Jordan Jackson

*completed the Communication Skills Course titled*

### World Class Communication

*in Oakland, California on*
*February 11, 2014*

healthy
relationships
california
www.relationshipsca.org

Bento Leal
Authorized WCC Instructor